## CHARLIE PATTERSON v. STATE.

No. A.-6568.  Opinion Filed May 4, 1929.
Rehearing Denied July 27, 1929.
(279 Pac. 356.)

Mathers & Renegar, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, P. J.   The plaintiff in error, hereinafter called defendant, was convicted in the district court of Washita county on a charge of robbery with firearms, and was sentenced to serve a term of five years in the state penitentiary.

On October 15, 1924, the First State Bank of Canute was robbed by two persons, who came to the bank in a Ford car between 8 and 9 o'clock in the morning, and when the vault was opened held up the three employees of the bank with firearms, took about $4,400 in money and made their escape, going out of the town in a north-westerly direction.   It is the theory of the state that the actual robbery was committed by defendant and one Jim Cellen, alias Jim McGraw, and that they were met just after the robbery, a few miles north of Canute, by Tommy Patterson, a son of defendant, where they abandoned the Ford car in which they went to the town of Canute, and there got in the turtle-back of a Ford coupe driven by Tommy Patterson, who drove them to the home of one John Rupert, near Oklahoma City.   Tommy Patterson had been charged as one of the robbers, tried, and acquitted, and also one Ben Parks had been charged, tried, and acquitted prior to the trial of the defendant in this case.

The first assignment of error argued is the refusal of defendant's requested instruction as to the law requiring corroboration of the testimony of an accomplice.   The requested instruction is substantially correct; it varies very little from the court's instruction No. 6, which is:

"You are further instructed that, if you find and believe from the evidence that any person who has testified in this case is an accomplice, then you would not be at

liberty to convict the defendant on the uncorroborated testimony of such accomplice. A conviction cannot be had on the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof, but should go further and tend to connect the defendant with the commission thereof. An accomplice, as the word is here used, means any one connected with the crime committed, either as principal offender, or as an accessory, or one who aids and abets in the commission of an offense; it includes all persons who are connected with the crime by unlawful acts or omissions on their parts committed, either before or at the time of the commission of the offense charged in the information."

This instruction sufficiently states the law upon this point. Section 2701, Comp. Stat. 1921; Moss v. State, 4 Okla. Cr. 247, 111 Pac. 950; Fisher v. State, 18 Okla. Cr. 541, 196 Pac. 724.

It is next argued, and in fact the main contention is, that the evidence is insufficient to sustain the judgment. The star witness for the state was Jim Cellen, alias Jim McGraw, who by his own testimony participated in the robbery and was an accomplice of defendant. Cellen at the time was an inmate of the penitentiary at Granite, having been convicted of the robbery of a bank at Sharon, Oklahoma. See Patterson v. State, 42 Okla. Cr. 255, 275 Pac. 387. Also he had been convicted of robbing a bank at Avard, Oklahoma, and had pleaded guilty to an Oklahoma City pay roll robbery.

This witness testified in substance: That he came to Oklahoma City some three weeks before the robbery. That he learned defendant wanted some one to rob banks, and they got together and discussed the robbery, and that Tommy Patterson also was a participant. That a week

before the robbery the two Pattersons went with him to the town of Canute to look over the situation with a view of selecting a bank to rob. That the two Pattersons remained near the depot, while the witness Cellen went in the bank, posed as a cotton buyer, and talked to the employees of the bank and two other persons, to whom the bankers introduced him. That two days before the robbery he and defendant stole a Ford coupe, which Tommy Patterson drove to the place of M. M. Smith, near Foss, a few miles from Canute. The following day he and defendant stole a Ford car, and also went to the Smith place, and early on the following morning went to Canute and arranged for Tommy Patterson to meet them with the coupe a mile or two northwest of Canute. That he and defendant then went to the bank; witness went inside and engaged the employees in conversation, while defendant waited across the street. As soon as the vault was opened, defendant also came in the bank and by the use of firearms they forced the employees to deliver the money in the bank, and, after locking the employees in the vault, left in the car which they had parked outside. That the money was put in a sack, which had been furnished by M. M. Smith. They then drove northwest and rejoined Tommy Patterson, and there abandoned the car in which they were riding, got in the turtle-back of the coupe, and Tommy Patterson then drove them in the direction of Oklahoma City. After passing the town of Bridgeport, they got out of the turtle-back and rode in the seat. Late in the afternoon they reached the residence of John Rupert, where they divided the money and made a small contribution to Rupert, and then went to Oklahoma City. There are various circumstances and details not recited.

The employees of the bank, in the trial of Parks, had previously testified that Ben Parks was the person who

came to the bank, posed as a cotton buyer, and who later participated in the actual robbery. There is, however, strong evidence that the employees of the bank were mistaken in identifying Parks as one of the participants, and that Cellen was in fact an active participant as he testified. There are various details of Cellen's testimony, corroborated by other witnesses, which it seems extremely unreasonable he could know, unless actually present as he testified. For instance, Ab Gunter, living near Canute, testified that on the morning the bank was robbed he saw a man go into the bank; that the witness then got a sack of flour and walked by the bank with it on his shoulder. This detail is the same as the testimony of Cellen, who testified to this circumstance. Z. S. Riggs, who was at the bank on the day Cellen claims to have first appeared there, posing as a cotton buyer, a week before the robbery, and was at that time introduced to him, positively identified Cellen. G. J. Lee, a farmer with Riggs, also identified him, but not so positively. A. L. Lawson testified in substance that on the occasion of the robbery he was picking cotton 2 1-2 miles northwest of Canute; that he saw a car headed north, and also a Ford coupe a little north of it; that the coupe came up to where the other car had stopped, and turned around, and he saw a couple of men catch on the running board of the coupe; that one of them had something in his hand, which he put in the turtle-back of the car, which looked like a sack. Oscar Nobles, with Lawson at the time, testified and substantially to the same effect as Lawson. The testimony of these witnesses closely corroborates that of Cellen. John Rupert and his son, Ed Rupert, in substance testified that about 3 o'clock in the afternoon of the day of the robbery Charlie Patterson, his son Tommy Patterson, and Mc-Graw (Cellen) came to his place southwest of Oklahoma

City; that Tommy Patterson came to the house, asked for food, and they took some 150 or 175 yards from the house, where defendant and McGraw or Cellen were; that when he took the basket back to the house it contained 21 $1 bills. This also closely follows the testimony of Cellen.

It is exclusively within the province of the jury to weigh the evidence, determine the credibility of the witnesses, say whom they will believe or disbelieve, and settle the issues of fact. When the jury have seen the witnesses, heard their testimony, observed their manner of testifying, their candor and frankness, or the lack thereof, and by their verdict have settled the issues of fact, and the trial court, who also has seen the witnesses, approves the verdict, it comes to this court, not upon the proposition that the verdict is against the weight and credibility of the evidence, but upon the proposition that it is contrary to the evidence. In such case, unless we can say there is no competent evidence in support of the verdict and judgment, or that the jury were influenced by prejudice or other improper motives in arriving at their verdict, this court will not reverse a conviction for insufficiency of the evidence. It appears to us that the jury had ample evidence, although it is conflicting, from which they might legitimately draw the conclusion of defendant's guilt. We are not at liberty to reverse the case for insufficiency of the evidence.

The case is affirmed.

DAVENPORT and CHAPPELL, JJ., concur.